# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

DAWN MARIE COEY,

    Plaintiff,

v.                                          Civil Action 2:18-cv-301
                                            Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

## OPINION AND ORDER

Plaintiff, Dawn Marie Coey, brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits ("DIB"). For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

### A. Procedural Background

Plaintiff applied for DIB on December 4, 2012, alleging disability beginning March 31, 2008, due to numerous physical and mental impairments. (Doc. 8-5, Tr. 272, PAGEID #: 322). An Administrative Law Judge (the "ALJ") held a hearing (Doc. 8-2, Tr. 38–65, PAGEID #: 85–112) after Plaintiff's application was denied initially (Doc. 8-4, Tr. 143–45, PAGEID #: 192–94) and upon reconsideration (*Id.*, Tr. 155–57, PAGEID #: 204–06). The ALJ denied benefits in a written decision. (Doc. 8-3, Tr. 120–28, PAGEID #: 168–76). The Appeals Council remanded the case, (Doc. 8-3, Tr. 135–37, PAGEID #: 183–85), and another hearing was held on May 17, 2017. (Doc. 8-2, Tr. 67–102, PAGEID #: 114–49). On July 26, 2017, the ALJ denied benefits

in a written decision. (*Id.*, Tr. 10–28, PAGEID #: 57–75). That decision became final when the Appeals Council denied review on February 5, 2018. (*Id.*, Tr. 1–6, PAGEID #: 48–53).

Plaintiff filed this case on April 5, 2018 (Doc. 1), and the Commissioner filed the administrative record on June 13, 2018 (Doc. 8). Plaintiff filed a Statement of Specific Errors on August 29, 2018 (Doc. 13), the Commissioner responded on October 15, 2018 (Doc. 14), and Plaintiff replied on October 30, 2018 (Doc. 15).

**B. Relevant Medical Records**

*1. Dr. Carey's Records and Opinion*

Dr. Jeffrey Carey, a urologist, is one of Plaintiff's treating physicians. He began treating Plaintiff in August of 2008. (*See, e.g.*, Doc. 8-2, Tr. 718, PAGEID #: 771). At that time, Plaintiff reported the following relevant symptoms: excessive thirst, abdominal pain, nausea and vomiting, urine retention, urine frequency, and painful urination. (Tr. 398, PAGEID #: 450). Dr. Carey noted that Plaintiff had refractory overactive bladder and pelvic pain, and had failed multiple drug trials and behavioral modifications without improvement. (Tr. 400, PAGEID #: 452). Dr. Carey reported that Plaintiff would "attempt a trial of amitriptyline. If she is unresponsive, she will proceed with a trial of InterStim." (*Id.*). On October 8, 2008, Dr. Carey successfully implanted the InterStim device. Tr. 401–02; PAGEID #: 453–54).

At a follow-up appointment later that year, Dr. Carey noted, "[Plaintiff] continues to do well with InterStim Therapy. She is elated with her response with marked improvement in urinary frequency and pelvic pain. Her husband states 'you gave me my wife back.'" (Tr. 396, PAGEID #: 448).

Plaintiff again saw Dr. Carey on June 10, 2009, where she noted continued urgency, incontinence, and pain relieved by urination. (T. 390; PAGEID #: 442). Dr. Carey summarized

that visit as follows:

> [Plaintiff] has returned to pelvic pain, frequency with appropriate sensation of stimulation. She has failed multiple prior therapies. Her urinalysis demonstrates probable UTI. . . . I recommend a reprogramming of her device if her symptoms don't improve with treatment of her UTI. We also discussed a trial of Celebrex which was started and UTI prophylaxis with methenamine. Myofacial release and pelvic muscle rehab pain as well as pudencal neuromodulation were discussed.

(392– 93, PAGEID #: 444–45).

Several years later, on February 20, 2015, Dr. Carey completed a Bladder Problem Medical Source Statement. (Tr. 718–21; PAGEID #: 771–74). He stated that: Plaintiff has urinary frequency that causes her to urinate approximately "[e]very 2 hours." Dr. Carey projected that Plaintiff would not need time to clean up and change clothes following urinary incontinence during an 8-hour work day, and opined that "stress would not affect her urinary frequency." Dr. Carey additionally estimated that Plaintiff would "never" miss work due to her urinary incontinence as long as "bathrooms are available." Dr. Carey also noted that, in his opinion, Plaintiff had the ability to sit for a two-hour period. (*Id.*). As explained more thoroughly below, there is some dispute regarding Dr. Carey's opinion about how often Plaintiff needs an unscheduled restroom break. *See infra* at 10.

### C. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2009. (Doc. 8-2, Tr. 12, PAGEID #: 59). The ALJ also found that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of March 31, 2008, through her date last insured. (*Id.*). The ALJ determined that Plaintiff's severe impairments consisted of chronic interstitial cystitis, irritable bowel syndrome, gastroenteritis, fibromyalgia, Graves' disease, migraines, bipolar disorder, depression and anxiety, none of which alone or in combination met or medically equaled the severity of a listed impairment. (*Id.*, Tr. 12–

3

14, PAGEID #: 59–61). In terms of residual functional capacity ("RFC"), the ALJ found:

> [T]he claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(a) except for the following restrictions: She could have lifted up to 50 pounds occasionally. She could have frequently lifted or carried up to 25 pounds. She could have stood/walked for approximately two hours at a time for a total of four hours in an eight-hour workday. She could have sat for approximately two hours at a time for a total of four hours during an eight-hour workday, with normal breaks defined as 10-15 minutes every two hours and a one-half-hour lunch break. She could have never climbed ladders, ropes or scaffolds but could have occasionally climbed ramps or stairs. She could have occasionally balanced, stooped, couched, kneeled and crawled. She should have avoided concentrated exposure to extreme cold, extreme heat, wetness or humidity. She should have avoided all exposure to unprotected heights, use of moving machinery and commercial driving. She would have been limited to performing simple, routine and repetitive tasks in a low-stress environment, defined as: One that is free of fast-paced production requirements; involving only simple, work-related decisions; and with few, if any, workplace changes.

(*Id.*, Tr. 16, PAGEID #: 63).

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To that end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

4

## III. DISCUSSION

Plaintiff assigns one error. She asserts that the ALJ "failed to reconcile his RFC determination" with the opinion of treating physician, Dr. Jeffrey Carey, and provided "no logical reasons for discounting only the disabling portions of Dr. Carey's opinion[.]" (Doc. 13 at 8). More specifically, Plaintiff argues that the ALJ erred by not adopting Dr. Carey's opinion regarding how often Plaintiff would need a restroom break and how often she would be off task.

### A. RFC Formulation and Treating-Physician Rule

In considering Plaintiff's arguments, a number of regulations and rules guide the Court. To start, a plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ is charged with evaluating several factors when determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

In addition, two related rules govern how the ALJ was required to analyze Dr. Carey's

opinion. *See Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2). The goal underlying the good reasons rule is two-fold. First, it allows a plaintiff to understand her case, particularly where a plaintiff knows her physician deemed her disabled and thus "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Blakely*, 581 F.3d at 407 (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, "it ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

The good reasons rule requires an ALJ's determination to be supported by the evidence in the case record and "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Under the good reasons rule, if an ALJ "declines to give a treating source's opinion controlling weight, he must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of

6

examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Fletcher v. Comm'r of Soc. Sec.*, 9 F. Supp. 3d 817, 828 (S.D. Ohio 2014) (quoting *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. § 406.1527(c)(2)–(6) (setting forth the relevant factors). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013); *see also Gayheart v. Comm. of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based the length, frequency, nature, and the extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence.").

**B. Analysis**

As noted, Plaintiff contends that the ALJ improperly discounted Dr. Carey's opinion in two ways. First, Plaintiff argues that the RFC fails to incorporate her need for restroom breaks. And, second, Plaintiff contends that the ALJ should have adopted Dr. Carey's estimate that Plaintiff would be off-task fifteen percent of the time. The Court disagrees.

In relevant part, the ALJ found that Plaintiff has the residual functional capacity to sit "for approximately two hours at a time for a total of four hours during an eight-hour workday, with normal breaks designed as 10-15 minutes every two hours and a one-half hour lunch break." The ALJ expressly considered Plaintiff's need for restroom breaks:

> Medical evidence does not substantiate the claimant's allegations that she needed to use the bathroom up to 20 times daily and up to seven times during an eight-hour shift prior to the date last insured. However, before contrasting her allegations with the medical evidence the undersigned will address several issues that mitigate the limiting effects of the claimant's urinary symptoms. First, the undersigned recognizes that, in light of her impairments, the claimant will need to

7

use the restroom more often than other workers do. However, the undersigned emphasizes that the aforementioned residual functional capacity contemplates the claimant receiving several normal breaks during the day, during which she could use the restroom. Additionally, while the undersigned recognized that episodes of urinary urgency or incontinence may lead to uncomfortable or embarrassing situation, these symptoms would not necessarily prevent the claimant from working. The claimant could mitigate such effects with minimal adaptations, such as wearing protective undergarments.

Even the assessments of the claimant's treating sources do not adequately substantiate the claimant's allegations regarding the frequency with which she would have needed to use the restroom during the period under consideration. One source indicated that the clamant would have needed to use the bathroom every one or two hours (15F/3). While the claimant theoretically may have needed to use the restroom up to seven times in an eight-hour shift at this rate, on average, she would not have required such frequent bathroom breaks. Another treating source indicated that the claimant would have only required two unscheduled bathroom breaks a day (15F/3). The undersigned finds the latter assessment more useful since it contemplates the claimant using the restroom during scheduled breaks. Additionally, this latter assessment comports with the aforementioned improvement of her urinary symptoms after the implantation of a nerve stimulator in her bladder.

(Tr. 18–19; PAGEID #: 65–66).

In addition, the ALJ addressed Dr. Carey's opinion and explained why he assigned "great weight" to "most portions of the assessment":

As for the opinion evidence, the undersigned gives great weight to most portions of the assessment of Jeffrey Carey, M.D., one of the claimant's treating physicians, with the exception of his assessments regarding the time that the claimant would spend off task (15F). Although he rendered this assessment on February 20, 2015, he indicated that her first treated the claimant in August 2008, an account, which the record corroborates (1F/16 and 15F/1, 4). Dr. Carey noted that the claimant benefited from nerve stimulation in her bladder (15F/1). Among other limitations, Dr. Carey indicated that the claimant would need to take two unscheduled bathroom breaks during the day, with each taking ten minutes (15F/3). He espoused similar exertional restrictions for the claimant as those adopted by the undersigned (15F/2-3). Finally, he indicated that the claimant would spend 15 percent of the workday off task and would not miss work provided she had a bathroom available (15F/3-4). The undersigned notes that the ten-minute bathroom breaks contemplated by Dr. Carey is accommodated by two regular breaks contemplated in the aforementioned statement of the claimant's residual functional capacity.

8

> If a treating source's medical opinion is well-supported by medically acceptable clinical or diagnostic techniques and is not inconsistent with the other substantial evidence, it should receive controlling weight (20 CFR 404.1527). Although the medical evidence supports most of the restrictions espoused by Dr. Carey, nothing supports Dr. Carey's assertion that her impairments would render the claimant off task for 15 percent of the workday. As discussed above, Dr. Carey's treating records document marked improvement of the claimant's urinary impairments following the impairment of a nerve stimulator.
>
> Furthermore, ambiguity exists regarding whether Dr. Carey included or excluded normal breaks in describing the claimant as off task for 15 percent of the day. As noted above, the claimant could use the restroom during normal breaks, which would mitigate the time she spent off task away from breaks. This distinction substantially affects the claimant's employability.
>
> Specifically, as explained further in a subsequent section, the vocational expert explained that if the normal breaks are included in the 15 percent off-task period, this restriction would not prevent a hypothetical individual from working. Due to such inconsistencies and ambiguities, Dr. Carey's assessment does not warrant much weight.
>
> If a treating source's medical opinion does not warrant controlling weight, it must be weighed using the following factors: Length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; whether the opinion concerns medical issues related to the treating source's area of specialization; any other factors which tend to support or contradict the opinion (20 CPR 404.1527).
>
> After considering these factors, the undersigned has concluded that most portions of Dr. Carey's assessment warrant great weight while his assessment regarding the time the claimant would have been off task warrants little weight. Dr. Carey treated the claimant starting in August 2008 and continued treating her through July 2009 for urinary issues. During this time, he saw the claimant several times. Most notably, in October 2008, he implanted a nerve stimulator in the claimant's bladder (IF). As noted above, the treatment records support and comport with most aspects of Dr. Carey's assessment in that the claimant's urinary symptoms improved in the months following this procedure. Dr. Carey's specialized expertise as a urologist lends additional weight to his assessment. Therefore, most aspects of Dr. Carey's assessment warrant great weight while his findings regarding the time the claimant would be off task warrant little weight.

(Tr. 20–21, PAGEID #: 67–68).

*1. Restroom Breaks*

9

Plaintiff's argument regarding her need for frequent restroom breaks relies on the Bladder Problem Medical Source Statement discussed above. In particular, she relies on Dr. Carey's answer to this question:



(Tr. 721; PAGEID #: 773).

Plaintiff argues that the degree symbol after the number 2 indicates that Plaintiff needs to use the restroom every two hours. (Doc. 13 at 11). In support, Plaintiff asserts that, "in the medical field," a degree symbol is a "typographical symbol that is used, among other things, to represent hours." (*Id.* at 11 n.1 (citing Medical Abbreviations, ACTX, available at https://www.actx.edu/respiratory/files/filecabinet/folder5/1101_abbreviations.pdf, last visited August 28, 2018)). Based on this interpretation, Plaintiff asserts that the ALJ erred by reading Dr. Carey's opinion as requiring only two unscheduled restroom breaks, rather than an unscheduled break every two hours. Plaintiff goes on to argue that this error was harmful because the RFC does not tolerate unscheduled restroom breaks every two hours.

Even accepting Plaintiff's interpretation of the form, there is no harmful error. Read in its entirety, the Bladder Problem Medical Source Statement demonstrates that Dr. Carey believes that Plaintiff generally can work for two hours without needing a restroom break. The RFC accommodates this frequency. Specifically, the RFC provides for normal breaks defined as 10-15 minutes every two hours and a one-half-hour lunch break. (*Id.*, Tr. 16, PAGEID #: 63). In addition, the VE testified that 1-2 unscheduled restroom breaks generally are tolerated in the workplace. (Tr. 101, PAGEID #: 148). Doing the math, this means that Plaintiff would never

have more than a two-hour stretch in which she could not use the restroom. Accordingly, the undersigned concludes that the RFC is consistent with Dr. Carey's opined restriction regarding Plaintiff's need for restroom breaks.

2. *Off Task*

Plaintiff also criticizes the ALJ for not incorporating Dr. Carey's opinion that Plaintiff would be off task 15 percent of the time. The ALJ thoroughly addressed this issue:

> [N]othing supports Dr. Carey's assertion that her impairments would render the clamant [sic] off task for 15 percent of the workday. As discussed above, Dr. Carey's treating records document marked improvement of the claimant's urinary impairments following the impairment of a nerve stimulator.
>
> Furthermore, ambiguity exists regarding whether Dr. Carey included or excluded normal breaks in describing the claimant as off task for 15 percent of the day. As noted above, the claimant could use the restroom during normal breaks, which would mitigate the time she spent off task away from breaks. This distinction substantially affects the claimant's employability.
>
> Specifically, as explained further in a subsequent section, the vocational expert explained that if the normal breaks are included in the 15 percent off-task period, this restriction would not prevent a hypothetical individual from working. Due to such inconsistencies and ambiguities, Dr. Carey's assessment does not warrant much weight.

(Doc. 8-2, Tr. 20–21, PAGEID # 67–68).

Thus, the ALJ's reasoning for rejecting the opined off-task limitation is clear. First, the ALJ reasonably concluded that, other than the need for restroom breaks, nothing in Dr. Carey's assessment explains why Plaintiff would be off task. Second, Dr. Carey's treating notes indicate improvement. In fact, on the form Dr. Carey noted, "underwent InterStim placement with good results in 10/2008." Plaintiff counters that the improvement was not long lasting, but Dr. Carey completed the from in 2015, and Dr. Carey has continued to treat Plaintiff. Accordingly, it is fair to assume that Dr. Carey understood Plaintiff's postoperative history. Third, the ambiguity the ALJ noted—whether normal breaks were included in Dr. Carey's opined 15 percent off-task

11

estimate—is not irrational. And, in any event, the first two reasons offered are sufficient to support the ALJ's opinion.

One last point. Plaintiff argues that the ALJ "could" have obtained additional evidence from a medical expert to clarify Plaintiff's need to restroom breaks. (Doc. 13 at 15). The Court agrees that the ALJ could have chosen that path but nothing in the regulations required him to do so. In sum, the ALJ followed the treating-physician rule with regard to Dr. Carey's opinion, and substantial evidence supports the articulated RFC.

## C.  CONCLUSION

For the reasons stated, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date:  December 6, 2018  /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE